# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**ANTWAIN ROBERTS,**

      Plaintiff,

v.                                      Civil Action No. **3:15CV420**

**SHERIFF McCABE,** *et al.*,

      Defendants.

## MEMORANDUM OPINION

Antwain Roberts, a former Virginia detainee[1] proceeding *pro se*, filed this 42 U.S.C. § 1983[2] action in which he alleges Defendants[3] violated his rights under the Eighth Amendment[4] and Fourteenth Amendment.[5] Roberts alleges that during his detention in the Norfolk City Jail, the Defendants subjected him to excessive force and denied him adequate medical care. Specifically, Roberts argues that he is entitled to relief on the following claims:

---

[1] Roberts is now incarcerated at the Greensville Correctional Center.

[2] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[3] The named Defendants are Sheriff McCabe, Deputy Satterthewaite, Dr. Johnson, and P.A. Davis of the Norfolk City Jail. The Court utilizes the spelling of Defendants' names provided by the Defendants in their submissions.

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[5] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

Claim One:   Defendant McCabe violated "Roberts's 8th and 14th Amendments when he allowed his deputy Defendant Satterthewaite to assault Mr. Roberts . . . and when he failed to write an incident report . . . ." (Statement of Claims 13, ECF No. 1–2.)[6]

Claim Two:   Defendant Satterthewaite violated "Roberts's 8th and 14th amendments" when he grabbed Roberts and forced him into a cell. (*Id.*)

Claim Three: Defendant Johnson was deliberately indifferent to Roberts's medical needs when he:
(a)   "he misdiagnosed Mr. Roberts's injury as muscle spasms from sleeping the wrong way;" and,
(b) "took over 20 days after the assault to even see Plaintiff Roberts." (*Id.* at 14.)

Claim Four:  Defendant Davis was deliberately indifferent to Roberts's medical needs when she "failed to recognize the serious injury to Mr. Roberts's right shoulder and refused him adequate medical treatment of physical therapy and follow up treatments" and told him to do exercises that made his condition worse. (*Id.*)

Roberts seeks monetary damages and an injunction in the form of ordering Defendants to provide therapy. (*Id.* at 16.)   The matter is before the Court on the Motion for Summary Judgment filed by Defendants McCabe and Satterthewaite (ECF No. 31) and the Motion for Summary Judgment filed by Defendants Johnson and Davis (ECF No. 39).   Roberts has responded. (ECF Nos. 37, 42.)  For the reasons that follow, the Motions for Summary Judgment will be GRANTED.

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the

---

[6] Roberts did not set forth his claims or the facts in support in his Complaint.  Instead, he attached a document entitled "Statement of Claims" that contains this information. (ECF No. 1–2.)  The Court corrects the spelling, capitalization, and punctuation in the quotations from Roberts's submissions.

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

Moreover, not all disputes of fact preclude summary judgment. Instead, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248. With respect to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

As to genuineness, the nonmoving party "must produce . . . evidence that creates a fair doubt; wholly speculative assertions will not suffice." *Bongam v. Action Toyota, Inc.*, 14 F. App'x 275, 280 (4th Cir. 2001) (internal quotation marks omitted). "A motion for summary judgment may not be defeated by evidence that is 'merely colorable' or 'is not sufficiently probative.'" *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1993) (quoting *Anderson*, 477 U.S. at 249–50). Nor will mere "metaphysical doubt as to the material facts" create a genuine dispute. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he nonmovant can show that a dispute is genuine only if it provides sufficient evidence so that a 'reasonable jury could return a verdict for the nonmoving party.'" *Wiggins v. DaVita Tidewater LLC*, 451 F. Supp. 2d 789, 796 (E.D. Va. 2006) (quoting *Anderson*, 477 U.S. at 248).

In support of their Motion for Summary Judgment, Defendant McCabe and Satterthewaite submit: (1) a large group of records including booking records, the internal investigation conducted of the incident, and Roberts's medical records (ECF No. 32–1); (2) an affidavit of Defendant Johnson (ECF No. 32–2 ("Johnson Aff.")); (2) an affidavit of Lt. Gerald Snyder (ECF No. 32–3 ("Snyder Aff.")); (3) an affidavit of Captain Gregory Toczek (ECF No. 32–4 ("Toczek Aff.")); (4) an affidavit of Deputy Vincent Cooley (ECF No. 32–5 ("Cooley Aff.")); and, (5) an affidavit of Defendant Satterthewaite (ECF No. 32–6 ("Satterthewaite Aff.")).

In Support of their Motion for Summary Judgment, Defendants Johnson and Davis submit: (1) an affidavit of Defendant Davis (Mem. Supp. Mot. Summ. J. Ex. 1, ECF No. 40–1 ("Davis Aff.")); (2) Roberts's medical records from Sentara Norfolk General Hospital prior to his admittance to the Norfolk City Jail (*id.* Encl. A); (3) Roberts's medical records from the

4

Norfolk City Jail (*id.* Encl. B); and, (4) an affidavit of Defendant Johnson (Mem. Supp. Mot. Summ. J. Ex. 2, ECF No. 40–2 ("Second Johnson Aff.")).[7]

In response, Roberts submitted two of his own affidavits (Mem. Opp'n Mot. Summ J. Ex. 2, ECF No. 37–2 ("Roberts Aff."); Mem. Opp'n Mot. Summ. J. Ex. 1, ECF No. 44–1 ("Second Roberts Aff.")); and the affidavit of a fellow inmate, Travis Brown (Mem. Opp'n Mot. Summ. J. Ex. 3, ECF No. 37–3 ("Brown Aff.")).[8] As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. The facts offered by affidavit or sworn declaration must also be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the statement in the affidavit or sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted). As discussed below, the material facts are largely undisputed. To the extent that Roberts's affidavit contains hearsay, the Court will not consider it here in its assessment of the propriety of the grant of summary judgment.[9] To the extent that Roberts uses his affidavit to generally deny facts in Defendants' affidavits and his medical records without

---

[7] The Court employs the pagination assigned by the CM/ECF docketing system for citations to the assorted records contained in ECF Nos. 32–1 and 40–1.

[8] Roberts also filed a lengthy Memorandum in Opposition to the Motions for Summary Judgment. None of the argument contained therein is admissible evidence.

[9] For example, Roberts contends that after the incident with Defendant Satterthewaite, Roberts "saw Deputy McFerrin and she had me talk to Lieutenant Ward about the attack. Deputy McFerrin stated to Lt. Ward that she use to work times with Deputy Satterthewaite and she has seen times where he has placed his hands on inmates for no reason . . . ." (Roberts Aff. ¶¶ 35–36 (paragraph numbers omitted).) Such a statement is inadmissible hearsay.

any factual support for his statements other than bald assertions or conclusions, these denials fail to present a genuine issue for trial.[10]

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motions for Summary Judgment. All permissible inferences are drawn in favor of Roberts.

## III.  RELEVANT FACTS ESTABLISHED FOR PURPOSES OF SUMMARY JUDGMENT[11]

### A.  Medical History Prior to May 4, 2015 Incident

Roberts arrived at the Norfolk City Jail on or around April 16, 2015. (Davis Aff. ¶ 1.) Prior to his detention in the Norfolk City Jail, Roberts had been seen at Sentara Norfolk General Hospital, on April 16, 2015, for complaints of right knee pain and right chest pain after being sprayed with mace and tackled by police when resisting arrest. (*Id.* ¶ 2; ECF No. 40–1, at 10.) Roberts's chest x-rays were unremarkable. (Davis Aff. ¶ 2; ECF No. 40–1, at 20.) The hospital provided him with Tylenol and discharged him to police custody. (Davis Aff. ¶ 2.)

That same day, Roberts was seen by medical staff at the jail for his receiving screening. Medical staff recommended that Roberts be placed in special needs housing. (*Id.* ¶ 3; ECF

---

[10] For example, throughout his affidavits, Roberts denies nearly every statement made by Defendants in their affidavits in a conclusory manner and claims that information from his contemporaneous medical record is false. Repeatedly, he states: "Never did I . . ." and then merely claims that the statement of the Defendants' affiant is false without any factual support for his contention. Many of these conclusory denials fail to present a genuine issue for trial. *Cf. Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24) (explaining that the court must adhere to the affirmative obligation to bar factually unsupported claims from proceeding to trial); *Penman v. Wooten*, No. 1:05–CV–1429, 2006 WL 3455232, at *1–2 (S.D. Ind. Nov. 29, 2016) (finding statement "at no time during my arrest did I resist or in any way attempt to escape the arresting officers" too conclusory to present a genuine issue for trial). Even considering these denials as creating dispute of fact, they are not material and are placed in footnotes.

[11] Much of the information Roberts provides in his affidavits is neither relevant nor probative to the instant claims and the Court omits that information.

No. 40–1, at 45, 47.)  On April 20, 2015, Roberts underwent an initial evaluation for asthma and hypoglycemia.  (Davis Aff. ¶ 4; ECF No. 40–1, at 48.)  Roberts indicated that he had pain on his "upper right chest side."  (Second Roberts Aff. ¶ 38.)  Upon physical examination, Roberts was found to have chest wall and shoulder tenderness to palpitation.  (Davis Aff. ¶ 4; ECF No. 40–1, at 50.)[12]  Defendant Johnson ordered Roberts to take ibuprofen for "[c]hest and shoulder pain." (ECF No. 40–1, at 52; Davis Aff. ¶ 4.)

On April 21, 2015, Roberts complained to medical that he was experiencing pain after doing push-ups.  (Davis Aff. ¶ 5; ECF No. 40–1, at 54; Second Roberts Aff. ¶ 40.)  Roberts indicated that he was not taking the prescribed ibuprofen in the morning because of "sleeping" and that he only had pain at night.  (Davis Aff. ¶ 5; ECF No. 40–1, at 54.)  Roberts was encouraged to follow Defendant Johnson's instructions.

On April 25, 2015, Roberts presented for a sick call with complaints of right rib pain. (Davis Aff. ¶ 6; ECF No. 40–1, at 55.)  Roberts presented with a bony abnormality on the right side of his ribs, was prescribed Tylenol, and was referred to the physician.  (Davis Aff. ¶ 6; ECF No. 40–1, at 55.)  Roberts was advised to reduce his physical activity.  (ECF No. 40–1, at 61.)

On April 30, 2015, Defendant Davis examined Roberts for complaints of a "knot" in his right chest due to falling on April 16, 2015 when his chest hit the curb.  (Davis Aff. ¶ 7; ECF No. 40–1, at 64.)  Roberts reported that he had only recently noticed the knot in this area and admitted that he had been doing push-ups recently.  (Davis Aff. ¶ 7; ECF No. 40–1, at 64.)

---

[12] Roberts states: "Never did I complain about my right shoulder.  Medical assumed and noted. . . .  On April 20, 2015, I only had a chest wall contusion."  (Second Roberts Aff. ¶ 38.) The contemporaneous medical record states that an examination found shoulder tenderness. Whether or not Roberts complained about his shoulder at this visit is ultimately not a material, disputed fact.  Roberts also does not dispute that he was directed to take medication for shoulder and chest pain.

Defendant Davis noted that a chest x-ray taken at the emergency room was negative and prescribed ibuprofen. (Davis Aff. ¶ 7; ECF No. 40–1, at 64.)

### B.   Facts Pertaining to May 4, 2015 Incident

On May 4, 2015, Defendant Satterthewaite was working on Post 8A. (Satterthewaite Aff. ¶ 2.) Roberts was waiting to be seen by medical, and he started talking with approximately six other inmates. (Roberts Aff. ¶ 2, ECF No. 37–2.) Defendant Satterthewaite came out of his sitting area and asked the inmates to keep the noise down. (Satterthewaite Aff. ¶ 2; Roberts Aff. ¶ 3.) Roberts "started singing quietly to [him]self and talking with the other inmates." (Roberts Aff. ¶ 4.)[13]   Defendant Satterthewaite came back out and asked Roberts to follow him. Defendant Satterthewaite ordered Roberts to go into Cell 8L02. (Satterthewaite Aff. ¶ 3.) Roberts avers that "Deputy Satterthewaite told [him] to make an unusual right turn where 8L01 through 8L03 was located." (Roberts Aff. ¶ 7.) Roberts walked past Cell 8L02. (Roberts Aff. ¶ 8; Satterthewaite Aff. ¶ 3.) Roberts contends he walked past Cell 8L01 and Cell 8L02 "because [he] did not know where [he] was going." (Roberts Aff. ¶ 8.) When Roberts walked past Cell 8L02 and got to Cell 8L03, Deputy Satterthewaite "grabbed [him] by [his] collar and [his] right shoulder, yanking [him] backwards very hard." (*Id.* ¶ 9.)[14]   Defendant Satterthewaite directed Roberts into Cell 8L02. (Satterthewaite Aff. ¶ 3.) According to Roberts,

---

[13] Defendant Satterthewaite avers that "Inmate Roberts ignored my request and continued talking loudly and singing." (Satterthewaite Aff. ¶ 2.) Roberts claims he was singing quietly to himself and talking with the other inmates. (Roberts Aff. ¶ 4.) While Roberts states "[n]ever did I ignore Deputy Satterthewaite's request and continue talking or singing loudly" (Roberts Aff. ¶ 5), it is undisputed that Roberts continued to sing and talk. Indeed, the affidavit submitted by Roberts from another inmate, Travis Brown, further confirms that "Mr. Roberts started singing to himself" after Defendant Satterthewaite had asked him to be quiet. (Brown Aff. ¶ 1, ECF No. 37–3.)

[14] Defendant Satterthewaite avers that "Roberts walked by Cell 8L02 and refused to enter the cell. I then grabbed Inmate Roberts by the shoulder and directed him into Cell 8L02." (Satterthewaite Aff. ¶ 3.)

I then ask Deputy Satterthewaite very loudly, "why are you grabbing me" and then he pushed me into cell 8L02 while stating "get your ass in there." While catching my balance, I walked further into the cell asking, "why are you pushing me in here." Satterwthewaite then stated, "cause you run you[r] fuckin' mouth too much." I then stated, "but I didn't do nothing." As Deputy Satterthewaite closed the door, I started yelling for a floor Lieutenant and stated "dude, you put your fucking hands on me."

(Roberts Aff. ¶¶ 11–15 (paragraph numbers omitted).)[15]   Roberts remained in Cell 8L02 for approximately ten to fifteen minutes until he was taken back to his cell block. (Satterthewaite Aff. ¶ 3.)

That same day, Roberts spoke with Captain Toczek while he was making rounds. (Roberts Aff. ¶ 25; Toczek Aff. ¶ 2.) Roberts indicated that Captain Toczek should speak with Deputy Satterthewaite about the incident. (Toczek Aff. ¶ 2.) Roberts did not complain of any injury from the incident at that time.[16]

On May 8, 2015, Roberts decided to file a complaint against Defendant Satterthewaite alleging that he had grabbed him by his jumpsuit. (Id. ¶ 3.) Captain Toczek informed Internal Affairs of Roberts's complaint. (Id.) Informal Affairs conducted an investigation and found Roberts's complaint was not supported by the facts. (Id.)

---

[15] Roberts submitted a portion of the interview transcript from the investigation of the incident with his Memorandum in Opposition to the Motion for Summary Judgment, Satterthewaite was asked what happened when he put Roberts in the cell. (ECF No. 37–1, at 34.) Satterthewaite responded: "Ah, he, he said that, 'That's assault,' I said, 'No sir, it's not.' He said, 'You've messed with the right educated black man.' And I said, 'Okay, have a nice day, sir.' The cell door closed and I went back to my duties." (Id. (emphasis omitted).) Roberts does not dispute this portion of the record.

[16] Deputy Cooley indicates that he examined Roberts and found no sign of injury. (Cooley Aff. ¶ 2.) Captain Toczek indicates that Roberts told him that he had no marks or bruises on him. (Toczek Aff. ¶ 2.) Roberts states that Deputy Cooley never examined him and Captain Toczek never asked him about his injuries. (Roberts Aff. ¶¶ 24, 33.) This is immaterial. The record establishes that Roberts did not complain of any pain or injury from the incident at this time.

### C.    Roberts's Medical Record after Incident

On May 6, 2015, Roberts had a scheduled physical and he "spoke to Defendant . . . Johnson about my injury to my right shoulder with pain and he told me that I would have to put in a sick call request because I was only being seen for a physical today." (Roberts Aff. ¶ 41.) On May 7, 2015, Roberts told a nurse through his cell bars that he was having "serious pain in my right shoulder," and the nurse told him to put in a sick call request. (*Id.* ¶ 42.)

On May 9, 2015, Roberts presented to medical with complaints of injury to his right arm and chest.  Roberts indicated that he had been injured in his right arm and chest during his arrest and stated that "he possibly reinjured [himself] during [the] incident on May 4th [where he was grabbed by neck and shoulders." (ECF No. 40–1, at 66; Davis Aff. ¶ 8.)  The nurse noted that Roberts was having difficulty raising his arm completely above his head and that he complained of pain only with rotational movement.  (ECF No. 40–1, at 67–68.)[17]  The nurse provided Roberts with instructions regarding proper lifting techniques and he was given a temporary activity restriction. (*Id.* at 24.) Roberts was referred to follow up with the doctor. (*Id.*)

On May 13, 2015, Roberts "asked the nurse through the cell bars about me seeing the Doctor and that I was hurting really bad." (Roberts Aff. ¶ 45.)  The nurse told him that he was on the referral list and to "have patience." (*Id.* ¶ 46.)  That same day, Roberts was seen by a mental health professional for complaints of "depression;" however he informed the examiner that he did "not want to do talking therapy or take meds." (ECF No. 40–1, at 26.)

On May 22 and 23, 2015, Roberts again told the nurse that he had been scheduled for a referral but had not been called yet.  (Roberts Aff. ¶ 47.)  Roberts told the nurse he "was having

---

[17] Roberts states that he told the nurse that "I couldn't move my arm" (Roberts Aff. ¶ 43); however, the medical record establishes that Roberts *could* move his arm but with difficulty.  In contrast, in his Complaint he claimed to have "stiffness and pain." (Statement of Claims ¶ 32.)

serious pain in my right shoulder with tingling in the elbow." (Id.)[18] The nurse took his name down to see if he was on the list. (Id. ¶ 48.) On May 27 and 28, 2015, Roberts sent communication forms to medical asking about the delay because he "was in pain." (Id. ¶ 49.)[19] The communication forms from May 27 and May 28, 2015 reflect that Roberts did not indicate that he was experiencing pain. (ECF No. 1–1, at 4.)

On May 29, 2015, Roberts was seen by Defendant Johnson for complaints of right neck and shoulder pain and numbness. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.) Roberts indicated that his current symptoms had been present for two to three weeks and that he had been taking ibuprofen sporadically. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.) Defendant Johnson diagnosed Roberts with "likely muscle spasm[s], mild and intermittent." (ECF No. 40–1, at 27.) According to Roberts, Defendant Johnson indicated that the pain and numbness stemmed from "the way [Roberts] sleep[s] and that no medication would help [his] problem." (Roberts Aff. ¶ 52.) Defendant Johnson discontinued ibuprofen and suggested Roberts perform muscle stretching exercises for his neck and shoulders. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.) Roberts indicated to Defendant Johnson that it "hurt[] very badly when [he] tried to move [his] arm and [his] neck, but [Defendant Johnson] stated to just try the exercises and discharged [him]." (Roberts Aff. ¶ 54.)

On June 15, 2015, Roberts put in another sick call request slip about his shoulder. (Id. ¶ 55.) On June 16, 2015, Roberts was seen by the nurse. (Davis Aff. ¶ 11; ECF No. 40–1, at 30.) Roberts reported intermittent right shoulder tingling for the past month and stated that the

---

[18] In his Complaint he indicates that he only told the nurse that he was "having tingling feelings moving down from his right shoulder to his elbow" but failed to mention any "serious pain." (Statement of Claims ¶ 35.)

[19] Once again, in his Complaint, Roberts makes no mention that he was experiencing pain. (Statement of Claims ¶¶ 37–38.)

first three fingers on his right hand felt numb. (Davis Aff. ¶ 11; ECF No. 40–1, at 30.) Roberts reported that on a scale of one to ten, with ten as highest, his pain was a two, and stated that he didn't really have any pain. (Davis Aff. ¶ 11; ECF No. 40–1, at 32.) Although not reported by the nurse, Roberts states that he told her when he "move[d] it, it's a seven." (Roberts Aff. ¶ 56.) The nurse gave Roberts instructions on proper lifting techniques and referred him for a follow up with a physician. (Davis Aff. ¶ 11; ECF No. 40-1, 31–32.)

On June 17, 2015, Roberts was seen by Defendant Davis for his complaints of right arm/shoulder tingling and muscle aches. (Davis Aff. ¶ 12; ECF No. 40–1, at 33.) Roberts reported that in early May 2015, he had been "grabbed hard by that shoulder and yanked," and the pain began approximately the next day and had not resolved. (ECF No. 40–1, at 33 (internal quotation marks omitted).) Defendant Davis noted that Roberts had been diagnosed with muscle spasms at the end of May. (*Id.*) Defendant Davis diagnosed Roberts with muscle strain, discussed therapeutic stretching exercises with him, and ordered Tylenol as needed. (Davis Aff. ¶ 12; ECF No. 40–1, at 33.) Although not reflected in the medical report from that examination, according to Roberts, Defendant Davis told him he may have a pinched nerve, and that it might go away with therapy and "that [he] would need an MRI." (Roberts Aff. ¶¶ 60–61.) Roberts asked if he "could get a[n] MRI and therapy" and Defendant Davis asked him about his release date. (*Id.* ¶ 62.) Roberts told her "hopefully in July" and Defendant Davis told him that he would have to wait until he was released to see a specialist. (*Id.* ¶ 63.)

On June 18, 2015, Roberts submitted a Healthcare Request stating that the tingling in his rights shoulder and fingertips had gotten worse and his pain was now a six on a scale of one to ten. (Davis Aff. ¶ 13; ECF No. 40–1, at 35.) Roberts requested stronger pain management and the request was considered by a Physician's Assistant, but was denied. (Davis Aff. ¶ 13; ECF

12

No. 40–1, at 35.)[20]   Roberts indicates that he was told to continue with the previous treatment instructions and if they did not help, to come back to medical. (Roberts Aff. ¶ 65.)

On June 19, 2015, Roberts submitted a Communication Form to medical where he indicated that he spoke with "Nurse Sommers [and she told him] that . . . Davis was not to change her previous orders of just pain medication." (ECF No. 1–1, at 10 (capitalization corrected).) Davis also asked the nurse for "a[n] arm brace and stack-a-bunk, but was denied." (*Id.*)[21]

On June 22, 2015, Roberts submitted a Communication Form to medical asking for a lower bunk because it was hard for him to climb to the top tier due to his arm injury. (*Id.* at 11.) Roberts contends that no one responded; however, the form was marked that the "[i]nmate [had] already put in a sick call slip." (*Id.*; Roberts Aff. ¶ 68.)

On June 25, 2015, Roberts was seen in the clinic "after colliding with [a] playmate in the gym." (ECF No. 40–1, at 36; Davis Aff. ¶ 14.)[22]   Roberts did not complain of any pain or injury. (ECF No. 40–1, at 36.) Roberts contends that he told the examining medical official that he had an injury to his shoulder. (Second Roberts Aff. ¶ 47.) Roberts did not report any pain from his shoulder at that time. (Davis Aff. ¶ 14.)

---

[20] In one of Roberts's affidavits he states "Never did I request for medication to be increased. Medical assumed and noted." (Second Roberts Aff. ¶ 46, ECF No. 44–1.)

[21] Roberts claims that he also indicated on the form that he needed a stack-a-bunk, arm brace, and therapy "because he was tired of holding my arm, guarding it, and it was hard climbing to the top tier of my sleeping rack." (Roberts Aff. ¶ 66.) Contrary to his affidavit, Roberts did not include this information on the June 19, 2015 Communication Form he submitted. (*See* ECF No. 1–1, at 10.)

[22] Roberts indicates that he "collid[ed] with another inmate from picking up a shirt at the same time and bumping heads," but does not deny that this occurred in the gym. (Second Roberts Aff. ¶ 47.)

On July 2, 2015, Roberts put in a Healthcare request complaining about his arm and shoulder. (ECF No. 44–15, at 1; Roberts Aff. ¶ 69.) The following day, Roberts was seen in medical by a nurse and requested a bottom bunk, further diagnostic testing, and physical therapy. (Davis Aff. ¶ 15; ECF No. 40–1, at 37.) The nurse reviewed the previous provider orders with Roberts, told him to discuss his complaints at his next chronic care appointment, and "[e]ducated [Roberts] to [d]ecrease physical activity." (ECF No. 40–1, at 37.) The nurse also noted that Roberts's chart showed that Roberts had collided with another inmate in the gym on June 25, 2015 and "had no complaints or concerns" at that time. (Id.) The nurse noted that Roberts did not agree with the plan of care. (Id.) Roberts contends that he told the nurse "that [his] whole hand was numb and that [he] couldn't move [his] arm 'cause it hurt to try." (Roberts Aff. ¶ 70.) According to Roberts the nurse told him "that I would have to get further treatment when I get released because Davis was not going to change her orders." (Id.)

On June 14, 2015, Roberts was seen by Defendant Davis for his chronic care exam complaining of right shoulder pain. (Davis Aff. ¶ 16; ECF No. 40–1, at 38.) Roberts's physical exam was normal and he was instructed to follow up in ninety days. (Davis Aff. ¶ 16; ECF No. 40–1, at 38–42.)[23]

Roberts was released or transferred from the Norfolk City Jail at some point prior to July 20, 2015. (See ECF No. 3, at 1.)

---

[23] Roberts contends that "[o]n July 14, 2015, I was not seen my any medical staff member for a chronic care follow up. That date is FRAUDULENT!" (Second Roberts Aff. ¶ 50.) However, the medical records are "E-signed" by both Defendant Davis and two other medical employees as of that date. (ECF No. 40–1, at 38–42.)

## IV.   FOURTEENTH AMENDMENT

### A.   Lack of Personal Participation by Defendant McCabe

In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff must "'affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).   Furthermore, "[t]he doctrine of *respondeat superior* has no application" under § 1983. *Id.* (citing *Vinnedge*, 550 F.2d at 928).   Roberts must demonstrate that each defendant had "personal knowledge of and involvement" in the alleged constitutional deprivation to establish liability under § 1983.   *Id.*

In Claim One, Roberts faults Defendant McCabe for "allow[ing] his deputy . . . to assault Mr. Roberts" and argues that Defendant McCabe as sheriff should "know what is going on inside his jail" and that he "clearly fail[ed] to do his duties."   (Statement of Claims 13.)   Roberts fails to demonstrate that Defendant McCabe had any personal knowledge of and involvement in the deprivation of his Fourteenth Amendment rights based on Defendant Satterthewaite's actions standing alone.[24]   Roberts also faults Defendant McCabe for "fail[ing] to write an incident report on the event that occurred on or about May 4, 2015."   (*Id.*)   The Court fails to discern, and Roberts fails to explain, how this inaction by Defendant McCabe violated his Fourteenth

---

[24] To the extent that Roberts contends that Defendant McCabe is somehow liable on a theory of supervisory liability, that claim would fail.   To show that a supervising officer failed to fulfill his duties to protect an inmate by ensuring his subordinates act within the law, the inmate must show that:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted) (citations omitted).   Roberts fails to demonstrate any one of these three factors.

Amendment rights. The record clearly establishes that, as of May 8, 2015, Roberts filed a complaint, and Internal Affairs was notified of the May 4, 2015 incident. (ECF No. 32-1, at 19; Toczek Aff. ¶ 3.)[25] An extensive internal investigation of the incident was conducted and Roberts was aware of this. (*See* ECF No. 32-1, at 19–65, 156.) Roberts fails to demonstrate that Defendant McCabe was personally involved in the assault by Defendant Satterthewaite. Claim One will be DISMISSED.

### B.   Excessive Force

Allegations of excessive force against a pretrial detainee must be evaluated under the Due Process Clause of the Fourteenth Amendment. *See Goodman v. Barber*, 539 F. App'x 87, 89 (4th Cir. 2013) (citation omitted). Under the Fourteenth Amendment standard, a plaintiff must show that the defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015) (citations omitted).[26]   Factors a court may consider to determine whether force was objectively unreasonable may include

> the relationship between the need for the use of force and the amount of force used; the extent of [the detainee's] injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the

---

[25] Roberts apparently is also disgruntled because he wanted to press criminal charges against Defendant Satterthewaite. (Statement of Claims ¶ 23.)

[26] In *Kingsley*, the Supreme Court determined that the appropriate standard for the Fourteenth Amendment is "only that the officers' use of that force was *objectively* unreasonable," not that "the officers were *subjectively* aware that their use of force was unreasonable . . . ." 135 S. Ct. at 2470.

threat reasonably perceived by the officer; and whether the [detainee] was
actively resisting.

*Id.* at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because "officers facing

disturbances 'are often forced to make split-second judgments' . . . . a court must judge the

reasonableness of the force used from the perspective and with the knowledge of the defendant

officer." *Id.* at 2474 (citing *Graham*, 490 U.S. at 397). The Court must recognize that "agents

of the state are permitted to exercise a certain degree of force in order to protect the interests of

society." *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir. 2013) (quoting *Justice v. Dennis*,

834 F.2d 380, 382 (4th Cir. 1987), *vacated on other grounds by* 490 U.S. 1087 (1989)). Thus,

not every "push or shove, even if it may later seem unnecessary" is serious enough to rise to the

level of a constitutional violation. *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008) (quoting

*Graham*, 490 U.S. at 396), *abrogated on other grounds by Wilkins*, 559 U.S. 34. Consequently,

the Court "must accord due deference to an officer's efforts to restrain a detainee when faced

with a dynamic and potentially violent situation; otherwise, 'we would give encouragement to

insubordination in an environment which is already volatile enough.'" *Scarbro v. New Hanover

Cty.*, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting *Grayson v. Peed*, 195 F.3d 692, 696 (4th

Cir. 1999)). In addition, the determination of whether an officer used excessive force must be

made "from the perspective of a reasonable officer on the scene, including what the officer knew

at the time, not with the 20/20 vision of hindsight." *Kingsley*, 135 S. Ct. at 2473.

Here, the force applied by Defendant Satterthewaite was a reasonable, measured,

response, in light of Roberts's refusal to follow the officer's command. The record demonstrates

that Defendant Satterthewaite applied force in a good-faith effort to maintain or restore

discipline. Defendant Satterthewaite asked Roberts and other inmates to be quiet. It is

undisputed that, despite this request, Roberts continued to sing. Because Roberts refused to

17

follow an order, Defendant Satterthewaite decided to move Roberts to one of the cells nearby. Despite being told to go into Cell 8L02, Roberts walked past the cell. Because Defendant Satterthewaite reasonably perceived that Roberts was once again refusing to follow an order, he "grabbed [Roberts] by [his] collar and [his] right shoulder, yanking [him] backwards very hard." (Roberts Aff. ¶ 9.) Defendant Satterthewaite directed Roberts into Cell 8L02. (Satterthewaite Aff. ¶ 3.) Defendant Satterthewaite's actions in grabbing and "yanking" Roberts to direct him to the correct cell were objectively reasonable considering the factors set forth in *Kingsley*. *See* 135 S. Ct. at 2473.

Roberts had failed to follow one direct order of Defendant Satterthewaite, and when he continued to walk past the cell that Defendant Satterthewaite had directed him to, Roberts became a moderate security threat to Defendant Satterthewaite because of his insubordination. Defendant Satterthewaite applied a measured amount of force, by grabbing, yanking, and directing him into the cell, in an attempt to have Roberts's comply with his directive. While in hindsight, it may have been unnecessary to grab and yank Roberts, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins*, 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see Orem*, 523 F.3d at 447; *Carson v. Mulvihill*, 488 F. App'x 554, 562 (3d Cir. 2012) (explaining that officer's actions in forcing inmate into cell by "launch[ing]" wheelchair through cell door and into steel bed "causing [inmate] to fall sharply onto his bed inside the door," was "at most, a malevolent shove" and not excessive force). Defendant Satterthewaite reasonably perceived that Roberts was being insubordinate, and made a split-second judgment to make Roberts comply with his directive. *See Orem*, 523 F.3d at 447; *Grayson*, 195 F.3d at 697; *cf. Whitley v. Albers*, 475 U.S. 312, 320 (1986) (explaining that courts recognize that corrections officers must act "in haste, under pressure, and frequently without the luxury of a second chance"). Any use of force immediately ended once Roberts was directed

18

into the cell. *See Haizlip v. Alston*, No. 1:14CV770, 2016 WL 4184426, at *11 (M.D.N.C. Aug. 5, 2016) (citation omitted) (finding force applied was proportional to its need where "force ended when its need subsided"); *cf. Gemaelich v. Johnson*, No. 7:12–CV–00263, 2013 WL 6145111, at *3 (W.D. Va. Nov. 21, 2013) (finding it "undisputable that the deputies used reasonable force in a good faith effort to maintain and restore discipline" when deputies pushed inmate's chest to the counter and held him down by the neck in response to inmate's refusal to obey command to keep hands on the counter), *aff'd* 599 F. App'x 473 (4th Cir. 2014). Under these circumstances, "the relationship between the need for force and the amount of force used to restore discipline was closely matched." *Haizlip*, 2016 WL 4184426, at *11 (citation omitted). The force applied by Defendant Satterthewaite was not objectively unreasonable when faced with perceived insubordination by Roberts.

One element of the multi-factored inquiry under *Kingsley* is the extent of an inmate's injuries from the use of force. However, this factor alone is not dispositive. Roberts puts forth evidence that Defendant Satterthewaite's action in grabbing him by the shoulder caused him escalating shoulder pain and numbness in his fingers. Roberts fails to put forth evidence that a reasonable officer could have foreseen that quickly grabbing and yanking Roberts to direct him into a cell would result in the shoulder injury Roberts later complained about. *See Cockrell v. Sparks*, 510 F.3d 1307, 1311–12 (11th Cir. 2007) (explaining that "an open-handed push or shove is as near to the minimum amount [of force] as an officer can employ" and officer could not have anticipated severity of injury). Moreover, the record does not support Roberts's conclusion that Defendant Satterthewaite's use of force caused Roberts's escalating shoulder pain and numbness. Whether or not Roberts had pre-existing shoulder pain is unclear. Roberts contends he never complained of a shoulder injury prior to the incident, however, the contemporaneous medical record indicates that Roberts had shoulder tenderness to the touch

19

prior to the use of force. Assuming that any shoulder pain and numbness occurred after the incident with Defendant Satterwaite, Roberts's evidence of his injury does not weigh strongly in favor of Roberts's claim that the force was unreasonable. Roberts's complaints of pain were intermittent and he was told to treat the numbness and pain with stretching exercises, medication, and decreased physical activity. The record shows that, more than once, Roberts did not follow the treatment plan prescribed by the medical department. For example, the record establishes he did not take pain medication as prescribed. The record also clearly establishes that while Roberts was complaining of this pain, limited range of motion, and numbness, he continued lifting and going to the gym. Roberts's continued physical activity tempers his complaints about the severity of his injury caused by Defendant Satterthewaite. In addition, medical staff clearly believed that any shoulder pain that may have been caused by Defendant Satterthewaite was exacerbated by Roberts's own actions as he was repeatedly told to limit his physical activity and provided with proper lifting techniques. A reasonable jury could not conclude that Roberts's injuries were caused exclusively by Defendant Satterthewaite. Thus, the extent of Roberts's injuries do not weigh in favor of establishing that Defendant Satterthewaite used excessive force.

Based on the factors outlined in *Kingsley*, Roberts fails to demonstrate that Defendant Satterthewaite's actions constituted an excessive use of force. Accordingly, Claim Two will be DISMISSED.

### C. Denial of Medical Care

The rights of a pretrial detainee complaining of inadequate medical care under the Fourteenth Amendment "are at least as great as the Eighth Amendment available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). To survive summary judgment on an Eighth Amendment claim, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that

subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

In the context of delayed medical care, in addition to demonstrating that a medical need that was objectively serious, a plaintiff must also establish that the delay in the provision of medical care "'resulted in substantial harm.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. 2012) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Moreover, "[i]t may not be seriously contended that any prisoner

detained for however short a period is entitled to have all his needed elective medical care performed while in custody . . . ." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974).

### 1.   Defendant Johnson

In Claim Three, Roberts argues that Defendant Johnson was deliberately indifferent to Roberts's medical needs when he: (a) "misdiagnosed Mr. Roberts injury as muscle spasms from sleeping the wrong way;" and, (b) "took over 20 days after the assault to even see Plaintiff Roberts." (Statement of Claims 14.)

At the core of Claim Three (a), Roberts simply disagrees with the medical judgment of Defendant Johnson concerning the diagnosis of Roberts's complaints of shoulder pain and numbness as stemming from the way in which Roberts sleeps. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). As explained below, Johnson fails to demonstrate any exceptional circumstances that would necessitate judicial review of Defendant Johnson's clinical judgment.

Despite Roberts's allegations, the evidence establishes that Defendant Johnson acted with no deliberate indifference. Instead, the record demonstrates that Defendant Johnson examined Roberts on May 29, 2015 for his complaints of right neck and shoulder pain and numbness. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.) Roberts indicated that his current symptoms had been present for two to three weeks and that he had been taking ibuprofen sporadically. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.) Defendant Johnson diagnosed Roberts with "likely muscle spasm[s], mild and intermittent." (ECF No. 40–1, at 27.) According to Roberts, Defendant Johnson indicated that the pain and numbness stemming from "the way [Roberts] sleep[s] and that no medication would help [his] problem." (Roberts Aff. ¶ 52.) Defendant Johnson discontinued ibuprofen and suggested Roberts perform muscle stretching exercises for his neck

and shoulders. (Davis Aff. ¶ 10; ECF No. 40–1, at 27.)  Roberts indicated to Defendant Johnson

that it "hurt[] very badly when [he] tried to move [his] arm and [his] neck, but he stated to just

try the exercises and discharged [him]."  (Roberts Aff. ¶ 54.)  It is unclear from the record

exactly what more or different Roberts wanted Defendant Johnson to do to treat his complaints.[27]

Roberts fails to demonstrate any deliberate indifference to his shoulder pain and numbness by

Defendant Johnson.  Claim Three (a) will be DISMISSED.

In Claim Three (b), Roberts faults Defendant Johnson because it "took over 20 days after

the assault to even see Plaintiff Roberts."  (Statement of Claims 14.)  Roberts apparently

disagrees with the timing of seeing the doctor and faults Defendant Johnson for the delay in his

treatment.  To prevail on this claim, Roberts must show a substantial harm resulting from this

twenty-day delay in care. *See Mata*, 427 F.3d at 751.  Roberts has failed to do so.

As a preliminary matter, Roberts complains that it took twenty days to be seen by

Defendant Johnson.  However, Roberts was seen by medical staff during this twenty-day delay;

he was just not seen by Defendant Johnson.  Roberts contends that he had a physical on May 6,

2015, and he "spoke to Defendant . . . Johnson about my injury to my right shoulder with pain

and he told me that I would have to put in a sick call request because I was only being seen for a

physical today."  (Roberts Aff. ¶ 41.)  However, Roberts fails to demonstrate that Defendant

Johnson was responsible for the delay in Roberts's referral to see him or that he had any control

over the scheduling of referrals to the doctor.  For this reason alone, Roberts fails to establish

that Defendant Johnson was deliberately indifferent to his medical needs.

---

[27] While Robert now seemingly argues that Defendant Johnson failed to acknowledge that Roberts's injuries were from the assault, not from the way he sleeps (*see* Mem. Opp'n Mot. Summ. J. 6, ECF No. 37), Roberts puts forth no admissible evidence that he informed Defendant Johnson that Roberts believed that his injuries stemmed from an assault.  Nor is that material. Roberts presented with complaints of shoulder pain and numbness and Defendant Johnson prescribed a course of treatment that was appropriate, in his medical judgment, for those complaints.

Roberts also fails to demonstrate substantial harm that was attributable to this twenty-day delay in seeing Defendant Johnson. *Mata*, 427 F.3d at 751 (10th Cir. 2005) (quoting *Oxendine*, 241 F.3d at 1276 (10th Cir. 2001)); *see Webb*, 281 F. App'x at 165. Roberts demonstrates no "lifelong handicap, permanent loss, or considerable pain" that resulted from this delay. *Shabazz*, 2012 WL 442270, at *5 (citation omitted).[28] Because Roberts fails to demonstrate substantial harm from the delay in treatment by Defendant Johnson, he fails to establish a claim of deliberate indifference by Defendant Johnson. Claim Three (b) will be DISMISSED.

### 2. Defendant Davis

In Claim Four, Roberts contends that Defendant Davis was deliberately indifferent to Roberts's medical needs when she "failed to recognize the serious injury to Mr. Roberts's right shoulder and refused him adequate medical treatment of physical therapy and follow[-]up treatments" and told him to do exercises that made his condition worse. (Statement of Claims at 14.) Roberts again simply disagrees with the medical judgment of Defendant Davis concerning the appropriate treatment plan for his shoulder pain and numbness. Roberts's disagreement with his prescribed medical care fails to state a § 1983 claim. *Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Moreover, Roberts fails to demonstrate any exceptional circumstances that would necessitate judicial review of Defendant Davis's clinical judgment.

To the contrary, Defendant Davis was attentive to Roberts's complaints of pain and numbness. Defendant Davis saw Roberts on one occasion, on June 17, 2015, for his complaints of right arm/shoulder tingling and muscle aches. (Davis Aff. ¶ 12; ECF No. 40-1, at 33.)

---

[28] At most, Roberts vaguely avers: "As of this day and time, I still have loss of function in my arm and hand due to numbness. I am currently being treated from the attack by Deputy Satterthewaite." (Roberts Aff. ¶ 77.) Roberts fails to demonstrate that any lasting numbness stems from the twenty-day delay in being seen by Defendant Johnson. Moreover, Roberts was released or transferred from the Norfolk City Jail in mid-July of 2015 and other than his conclusory statement that he is "currently being treated," he fails to offer any evidence that he has sought medical care for his shoulder pain and numbness.

Roberts reported that in early May 2015, he had been "grabbed hard by that shoulder and yanked," and the pain began approximately the next day and had not resolved. (ECF No. 40–1, at 33 (internal quotation marks omitted).)   Defendant Davis noted that Roberts had been diagnosed with muscle spasms at the end of May.   (*Id.*)   Defendant Davis diagnosed Roberts with muscle strain, discussed therapeutic stretching exercises with him, and ordered Tylenol as needed. (Davis Aff. ¶ 12; ECF No. 40–1, at 33.)

According to Roberts, although not reflected in the medical record, Defendant Davis told him he may have a pinched nerve, and that it might go away with therapy and "that [he] would need an MRI." (Roberts Aff. ¶¶ 60–61.) Roberts asked if he "could get a[n] MRI and therapy" and Defendant Davis asked him about his release date. (*Id.* ¶ 62.) Roberts told her "hopefully in July" and Defendant Davis told him that he would have to wait until he was released to see a specialist. (*Id.* ¶ 63.) Defendant Davis's statement that he would need to wait approximately a month to see a specialist, standing alone, is not deliberate indifference to Roberts's medical needs.   While Roberts apparently desired to have therapy or see a specialist immediately, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson*, 503 U.S. at 9 (citing *Estelle*, 429 U.S. at 103–04). Instead, Roberts's right to medical treatment was limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring*, 551 F.2d at 48. Roberts was also not entitled to "have all his needed elective medical care performed" during this short period of incarceration. *Kersh*, 501 F.2d at 589.

Roberts also fails to establish that this one-month delay in receiving therapy or seeing a specialist caused him substantial harm. *Mata*, 427 F.3d at 751.   Notably, Roberts fails to put forth any admissible evidence that he pursued seeing a specialist, had an MRI, or started therapy

after he was released.   Roberts fails to demonstrate that Defendant Davis was deliberately indifferent to his medical needs.

It is unclear what further treatment beside an MRI and therapy Roberts desired, but was denied, by Defendant Davis.  Roberts indicates that he put in various requests to medical on June 18, June 19, June 22, and July 2, complaining about shoulder pain and asking for a lower bunk. Roberts argues that he "complained to [P.A.] Davis many times, but she refused to change her treatment orders."  (Mem. Opp'n Summ. J. 24, ECF No. 37.)  Roberts fails to demonstrate that Defendant Davis was notified of all of these requests from Roberts, or that by refusing to change her prescribed treatment plan she denied him adequate medical care.

The record demonstrates that after Roberts submitted medical requests on June 18 and 19, his request for stronger pain medication was denied by Defendant Davis.  (Davis Aff. ¶ 13; ECF No. 40–1, at 35.)  Defendant Davis also indicated that she was not going to change her orders of Tylenol.  (ECF No. 1–1, at 10.)  However, Roberts denies that he asked for increased pain medication, but claims that the medical department simply assumed he did.   (Second Roberts Aff. ¶ 46.)  Thus, it is unclear why Roberts believes that Defendant Davis was deliberately indifferent to his complaints of pain in response to these requests.   Even if Roberts wanted stronger or different pain medication, "[w]hether and how pain associated with medical treatment should be mitigated is for [medical providers] to decide free from judicial interference, except in the most extreme situations."  *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). This is not such an extreme circumstance.  *See, e.g., Martinez v. Mancusi*, 443 F.2d 921, 924–25 (2d Cir. 1971) (granting relief when prison doctor forced prisoner plaintiff, without hospital ordered pain medication, to walk out of hospital and stand for meals after leg surgery for which hospital specialist had ordered plaintiff to lie flat and not to walk.)  To the extent that Roberts

disagreed with Defendant Davis's chosen manner to treat his pain, this fails to state an Eighth Amendment claim. *Wright*, 766 F.2d at 841 (citation omitted); *see Snipes*, 95 F.3d at 592.

On June 22, 2015, Roberts submitted a Communication Form to medical asking for a lower bunk because it was hard for him to climb to the top tier due to his arm injury. (ECF No. 1–1, at 11.) Roberts contends that no one responded; however, the form was marked that the "[i]nmate had already put in a sick call slip." (*Id.*; Roberts Aff. ¶ 68.) Roberts fails to demonstrate how Defendant Davis was involved with the failure to answer this Communication Form, or that she was put on notice of his desire for a lower bunk.

Notably, Roberts fails to include in this argument that he was seen in medical, on June 25, 2015, "after colliding with a playmate in the gym." (ECF No. 40–1, at 36; Davis Aff. ¶ 14.) Roberts did not complain of any pain or injury. (ECF No. 40–1, at 36.) Although not reflected in the medical record, Roberts claims that he told them he had an injury to his shoulder. (Second Roberts Aff. ¶ 47.) Roberts did not report any pain from his shoulder at that time. (ECF No. 40–1, at 36.)

On July 2, 2015, Roberts put in a Healthcare request complaining about his arm and shoulder. (ECF No. 44–15, at 1; Roberts Aff. ¶ 69.) The following day, Roberts was seen in medical by a nurse, and requested a bottom bunk, further diagnostic testing, and physical therapy. (Davis Aff. ¶ 15; ECF No. 40–1, at 37.) The nurse reviewed the previous provider orders with Roberts, told him to discuss his complaints at his next chronic care appointment, and "[e]ducated [Roberts] to [d]ecrease physical activity." (ECF No. 40–1, at 37.) The nurse also noted that Roberts's chart showed that Roberts had collided with another inmate in the gym on June 25, 2015 and "had no complaints or concerns" at that time. (*Id.*) The nurse noted that Roberts did not agree with the plan of care. (*Id.*)

On June 14, 2015, Roberts was seen by Defendant Davis for his chronic care exam complaining of right shoulder pain. (Davis Aff. ¶ 16; ECF No. 40–1, at 38.)  Roberts's physical exam was normal.  (Davis Aff. ¶ 16; ECF No. 40–1, at 38–42.)

The record demonstrates no deliberate indifference by Defendant Davis.  Instead, Roberts was seen by medical many times during his stay in the Norfolk City Jail.  Roberts simply desired a different course of medical treatment than he was prescribed.[29]  Accordingly, Claim Four will be DISMISSED.

### D.    Claim For Injunctive Relief is Moot

Roberts seeks relief in the form of the Court ordering Defendants to provide him with therapy.  Roberts was released from incarceration in the Norfolk City Jail in July 2015.  "[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the out-come."  *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).  Thus, "[o]nce an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of the claim."  *Id.* at 287 (holding transfer or release moots claim for injunctive relief).  Roberts's release from incarceration mooted his request for injunctive relief.  Accordingly, his claim for injunctive relief will be DISMISSED AS MOOT.

---

[29] Moreover, based on the current record, a reasonable juror could find that Roberts's ongoing shoulder pain and numbness stemmed from his continued physical activity, despite medical orders to limit that activity, not from any lack of treatment from Defendant Davis.

## V.    CONCLUSION

Accordingly, Defendants' Motions for Summary Judgment (ECF Nos. 31, 39) will be

GRANTED.  Roberts's claims will be DISMISSED.  The action will be DISMISSED.

An appropriate Final Order shall issue.

Date:   3/14/17
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge